**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RADIO ONE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 16 C 1867 |
| | ) | |
| v. | ) | Hon. Virginia M. Kendall |
| | ) | |
| DIRECT MEDIA POWER, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

On February 2, 2016, Plaintiff Radio One, Inc. filed this action against Defendant Direct

Media Power, Inc. ("DMP"), now a dissolved corporation, for breach of contract. (Dkt. 1).

DMP filed an Answer and Counterclaim[1] on February 26, 2016, but then failed to participate in

discovery as directed by the Court. (Dkts. 8, 9, 32). Accordingly, on October 3, 2016, the Court

entered an order of default against DMP, and on October 26, 2016, the Court entered a default

judgment in the amount of $1,398,658.58 plus post-judgment interest against DMP. (Dkts. 34,

38). The case is now in supplementary post-judgment collection proceedings. Currently before

the Court are Radio One's motions: (1) to set aside certain fraudulent transfers and for turnover

of certain assets (Dkt. 74); and (2) for a finding that DMP and its principal Dean Tucci are in

civil contempt of this Court and for a referral to the United States Attorney for prosecution of

Tucci for criminal contempt (Dkt. 78). Also before the Court is DMP's motion to vacate the

default judgment and dismiss the action for lack of jurisdiction. (Dkt. 88). For the reasons set

forth below, the Court denies Tucci's motion to vacate and dismiss (Dkt. 88), denies without

prejudice to renewal Radio One's motion for fraudulent transfer and turnover order (Dkt. 74),

and grants in part and denies in part Radio One motion for contempt (Dkt. 78).

---

[1] DMP's Counterclaim was voluntarily withdrawn on July 27, 2016. (Dkt. 17).

## BACKGROUND

Beginning in 2013, Radio One[2] and DMP had a business relationship where DMP would buy discounted radio airtime from Radio One and Radio One would invoice DMP. At some point in 2014, DMP stopped paying Radio One's invoices, and Radio One eventually filed this action to recover the unpaid amounts. At that time, 100% of DMP was owned by Dean Tucci and Tucci served as its president and CEO. As relevant herein, Tucci also owned 100% of following entities: TelDebt Solutions, Inc.; FDATR, Inc.; and Dang Enterprises, LLC. Not even one month after Radio One filed suit Tucci formed a new entity—DMP Holdings, Inc.—in which holds a 90% ownership interest and his significant other, Beatta Piliciauskiene, holds a 10% interest. Immediately after DMP Holdings was formed, Tucci transferred to it his ownership of DMP, TelDebt, and FDATR. Tucci's ownership of Dang was not affected.

On October 26, 2016, Radio One obtained a default judgment against DMP in the amount of $1,398,658.58 plus post-judgment interest, which remains unsatisfied. (Dkt. 38). Radio One issued a citation to discover assets on November 10, 2016, which was served on Tucci's executive assistant November 11, 2016. (Dkts. 75-15, 75-16). As relevant herein, the citation provided:

> YOU ARE PROHIBITED from making or allowing any transfer or other disposition of or interfering with any property not exempt from execution or garnishment belonging to any of the Judgment Debtors or to which any of the Judgment Debtors may be entitled to that may be acquired by or become due to any of the Judgment Debtors and from paying over or otherwise disposing of any money not so exempt that is due or becomes due to any of the Judgment Debtors, until further order of the Court or termination of the proceedings. You are not required to withhold the payment of any money beyond double the amount of the judgment.

(Dkt. 75-15) at 4. The citation set a hearing date for November 21, 2016. *Id.* Instead of appearing on the citation, DMP initiated Chapter 11 bankruptcy proceedings. *See In re Direct*

---

[2] In May 2017, Radio One changed its name to Urban One.

*Media Power, Inc.*, No. 16-36934 (Dkt. 1) (Bankr. N.D. Ill. Nov. 21, 2016); (Dkt. 75-23). DMP converted the bankruptcy to a Chapter 7 proceeding, and the case was dismissed on September 20, 2017. In March 2018, the bankruptcy court found that DMP had violated its orders during the proceedings, held DMP and Tucci in civil contempt, and ordered that they pay Radio One's attorneys' fees. *See generally In re Direct Media Power, Inc.*, 582 B.R. 739 (Bankr. N.D. Ill. 2018).

After the bankruptcy proceeding ended, Radio One immediately resumed the supplementary proceedings here by reissuing the previous citations (to DMP and U.S. Bank) and issuing eight additional citations. *See* (Dkts. 50, 52). Tucci sat for a citation exam on October 27, 2017. (Dkt. 75-15).

On November 1, 2017, Radio One filed a new action against Tucci for fraud and seeking to pierce the corporate veils of DMP and DMP Holdings and thereby hold Tucci liable for the default judgment. *See Urban One, Inc. v. Tucci*, No. 17 C 7892 (Dkt. 1) (N.D. Ill. Nov. 1, 2017). The Court granted Radio One's motion for a temporary restraining order in that case, held a three-day evidentiary hearing on Radio One's motion for a preliminary injunction, and granted the requested injunctive relief. That case remains pending.

Also on November 1, 2017, Radio One filed a Motion for Fraudulent Transfers and Turnover of Assets (Dkt. 74) and a Motion for Civil and Criminal Contempt Against Direct Media Power and Dean Tucci (Dkt. 78). In support of these motions, Radio One has offered the following evidence regarding transfers made after the default judgment, after the citation to discover, and during the bankruptcy proceedings. As of the date of the default judgment (October 26, 2016), DMP banked almost exclusively at U.S. Bank with accounts ending in 9293

and 8690.[3]  Between that date and November 11, 2016, DMP sent significant sums to other accounts that it held with Bank of America ("BOA") ending in 6530 and 6543 that had previously only been used for payroll purposes, and this was done to avoid a hold on those amounts by way of a citation proceeding as Tucci testified that he moved the money "to Bank of America to keep my corporation running."  (Ex. 75-18) (1/5/17 Tr. of Creditors Meeting Pursuant to Bankruptcy Code Section 341 ("341 Meeting")) at 47:14–25; *see* (Dkt. 76-4) (DMP U.S. Bank 8690 statement for 10/3/16 to 10/31/16); (Dkt. 76-5) (DMP U.S. Bank 8690 statement for 11/1/16 to 11/30/16); *see, e.g.*, (Dkt. 76-4) at 19 (for example, for check no. 130254 dated 10/27/16 for $20,000 made out to Direct Media Power and signed by Tucci, the memo reads: "8690 to 6530").

During this time, DMP also made transfers to Dang ($345,000) to a U.S. Bank account ending in 9319, TelDebt ($30,000) in the BOA account ending in 6556, and to Tucci's personal accounts at U.S. Bank ending in 9216 and 7601 ($7,900).  The transfers continued after the citation was served on DMP on November 11.  Specifically, between November 14, 2016 and the bankruptcy filing date (November 21, 2016), DMP transferred a total of $152,000 to Dang from both the U.S. Bank and BOA accounts, and $1,500 to Tucci's accounts.  *See* (Dkt. 76-1) (DMP BOA 6530 statement for 11/1/16 to 11/30/16); (Dkt. 76-3) (Check No. 2510 dated 11/21/16 from DMP BOA 6530 in the amount of $12,000 signed by Tucci with the memo "6530 to 9319"); (Dkt. 75-4) (DMP U.S. Bank 8690 statement for 10/3/16 to 10/31/16); (Dkt. 76-14) (U.S. Bank 9293 statement for 11/1/16 to 11/30/16).  Finally, after the bankruptcy proceedings

---

[3] In the Schedule A/B: Assets – Real and Personal Property submitted to the Bankruptcy Court in *In re Direct Media Power, Inc.*, No. 16-36934 (Bankr. N.D. Ill.), DMP represented that it "owned or controlled" the following accounts:  BOA 6530, U.S. Bank 8960, U.S. Bank 9293, BOA 6556, and BOA 6543.  *See* (Dkt. 84-3) at 1; *see also* (Dkt. 75-18) (341 Meeting) at 11:7–17 (Tucci affirmed under oath that he reviewed the Petition, Schedules, and Statement of Financial Affairs submitted and that they were true and correct).

began, even more large transfers were made from DMP to TelDebt ($470,851), Dang ($4,000), and again Tucci ($3,600). *See* (Dkt. 76-2) (BOA 6530 statement for 2/1/17 to 2/28/17). Radio One seeks to void these transfers and also uses them as a basis for its argument that Tucci should be held in contempt for violating the citation's restraint provision.

On July 15, 2018, Direct Media Power moved to vacate the default judgment under Federal Rule of Civil Procedure 60(b)(4) and to dismiss the case for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). (Dkt. 88). The Court addresses each motion in turn.

## DISCUSSION

I.     **DMP's Motion to Vacate Default Judgment and Dismiss for Lack of Diversity Jurisdiction (Dkt. 88)**

Although it was filed last, the Court first addresses DMP's Federal Rule of Civil Procedure 12(b)(1) and 60(b)(4) motion to vacate the default judgment entered in this matter and dismiss the action for lack of jurisdiction. Radio One's Complaint bases this Court's jurisdiction on diversity of citizenship. (Dkt. 1) at ¶ 4; *see* 28 U.S.C. § 1332(a). Section 1332(a)(1) states that "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states." A corporation, for diversity purposes, is "deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business." 28 U.S.C. § 1332(c)(1); *see Hertz Corp. v. Friend*, 559 U.S. 77, 80 (2010). The Court considers the entire record in evaluating the existence of diversity jurisdiction. *See Harmon v. OKI Sys.*, 115 F.3d 477, 47980 (7th Cir. 1997).

At this late juncture, DMP moves to vacate the default judgment and dismiss the case arguing that it is not diverse from Radio One, a citizen of Delaware and Maryland. This is

because DMP, whose principal place of business is in Illinois, argues that it has two states of incorporation—*both* Illinois and Delaware—and therefore is a citizen of both states. (Dkt. 88) at 2. However, the evidence submitted in the record in this matter indicates that there were two separate DMP entities—a Delaware one and an Illinois one—and that only the Illinois entity is implicated in these proceedings.

Direct Media Power, Inc. was incorporated in Delaware on April 7, 2010. (Dkt. 90-1) at 1 (Delaware Entity Details). According to the Delaware Division of Corporations website, only two filings have been made on its behalf: (1) a Certificate of Incorporation for Stock Corporation that was filed on April 7, 2017; and (2) a Certificate for Revival of Charter for a Voided Corporation that was filed on May 3, 2013. (Dkt. 92-2). As of March 1, 2016, the status for this entity has been "Void, AR's or Tax Delinquent." *Id.* The Delaware entity used the federal Employment Identification Number 27-2300595.

DMP was incorporated in Illinois on May 21, 2013. (Dkt. 90-1) at 2 (Illinois Corporation File Detail Report). DMP was involuntarily dissolved on October 13, 2017. *Id.* The federal EIN for DMP is 38-3907150.

Despite their separate incorporations, DMP points to Tucci's testimony that "the corporations are the same." (Dkt. 88) at 2. But Tucci also testified "[i]t was two corporations. There was a corporation started in 2010 in Delaware, and then one started in 2014 in Illinois." (Dkt. 90-2) (1/31/17 D. Tucci Dep. in Case No. 16 BK 36934) at 7:12–14; *see also* (Dkt. 90-3) (No. 17 C 7892, P.I. Tr. Vol. 1) at 17:11–17 (Testimony of Desiree Keller) ("A. There's two separate entities for Direct Media Power. There's one that begins with a 27, and that's incorporated in the State of Delaware as of April 2010. And there's a secondary one in May of 2013, which was essentially the same company. Q. And that's the one that began with the 38.

A. Yes."). In addition, each entity either became inoperative on different dates—the Delaware entity entered void status in March 2016; the Illinois entity was involuntarily dissolved through bankruptcy proceedings in October 2017.

In light of this legal distinction, the Court finds that only the Illinois DMP entity is involved in these proceedings. For example, in applying for credit with Radio One in June 2013, Tucci listed only the EIN 38-3907150 and authorized Radio One to contact certain banks in connection with DMP's credit application using this information. (Dkt. 92-8). In its Answer in this case, DMP admitted that it was a "corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Wood Dale, Illinois. . . . [DMP] is a citizen of Illinois." *See* (Dkt. 8) at ¶ 3. Direct Media Power's response briefs the contempt and turnover motions likewise only discuss the Illinois entity. *See* (Dkt. 83) at 2–3; (Dkt. 84) at ¶ 4; (Dkt. 85) at 3. Further, the current motion practice involves DMP's alleged insolvency, bankruptcy, and pre- and post-bankruptcy transfers. The documents submitted by DMP are clear that only the Illinois entity was the bankruptcy debtor. *See* (Dkt. 90-2) (Tucci Dep.) at 8:20–9:2 ("Q. And the Direct Media Power, Inc. that you incorporated in the state of Illinois in 2014 [sic], that is the debtor in this case? A. That is the tax ID in Chapter 11, correct."). The bankruptcy filings similarly reflect this fact. *See In re Direct Media Power, Inc.*, No. 16-36934 (Dkt. 1) (Bankr. N.D. Ill.) (listing the debtor as "Direct Media Power, Inc." and the associated federal EIN as 38-3907150); (Dkt. 75-23); *see also In re Direct Media Power, Inc.*, 582 B.R. 739, 742 (Bankr. N.D. Ill. 2018) ("The debtor in this bankruptcy case, DMP, is wholly-owned by DMP Holdings, Inc. [], also an Illinois corporation."). And Tucci testified under oath that DMP "is an Illinois corporation." (Dkt. 75-18) (341 Meeting) at 14:25–15:1.

For these reasons, DMP's argument that it was a single Delaware entity that was compelled to add a dual incorporation in Illinois is not factually supported. (Dkt. 88) at 2. True, Tucci testified that "[t]he Illinois Department of Employment Security told us we had to do this"—meaning incorporate DMP in Illinois, but again record indicates that the entities remained separate. For example, Tucci testified that he filed an Illinois foreign corporation registration for the Delaware entity and did not dissolve the Delaware entity upon the new Illinois incorporation, but that he could no longer use the Delaware entity's EIN. *See* (Dkt. 90-3) at 305:13–24. Even though the Delaware entity may not have been in use, it still existed as a separate company. The case may have been that Tucci failed to properly treat the entities as separate, but they were established as separate nonetheless.

Moreover, DMP's involuntary-compulsion argument lacks applicable legal support. DMP cites to *Missouri Pac. R.R. v. 55 Acres of Land*, 947 F. Supp. 1301 (E.D. Ark. 1996) and *In re Paulsboro Derailment Cases*, 2013 WL 6903958 (D.N.J. Dec. 31, 2013), but not only are these cases not precedential, they also are distinguishable. (Dkt. 88) at 3. First, neither case actually dealt with a second compulsory incorporation, the kind of which is insinuated by DMP here. Instead, they involved state re-domestication statutes—that is, statutes that required procedures *less than* local incorporation—that were specific to railroad companies. In the end, both railroad companies were found to be citizens of their states of incorporation, not the state in which they domesticated or conducted business under the statutes at issue. *See In re Paulsboro Derailment Cases*, 2013 WL 6903958, at *5 (finding that New Jersey does not require railroads to reincorporate there nor did the railroad at issue take any steps to reincorporate there); *Missouri Pac. R. Co.*, 947 F. Supp. at 1307 ("the Court finds that the Arkansas statute at issue is merely a domestication statute and that it does not render MoPac a citizen of Arkansas for purposes of

federal court diversity jurisdiction"). Thus, neither re-domestication case supports DMP's involuntary reincorporation argument and DMP fails to provide any statutory or other authority regarding compulsory incorporation in Illinois. DMP's citation to *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330 (11th Cir. 2011) fares no better, as that case, which involved a dispute over whether to impute the foreign citizenship of two non-defendant corporations to an individual defendant, is completely off base. Although the opinion momentarily discusses the differences between corporate and individual citizenship, it has no bearing on this action.

Finally, court records reflect that in the Southern District of New York, in *Westwood One, Inc. v. Direct Media Power, Inc.*, where Westwood One initially brought a state-court breach of contract claim against DMP for the alleged failure of DMP to pay for certain media advertising time, DMP removed the case to federal court on the basis of diversity jurisdiction. *See Westwood One, Inc. v. Direct Media Power, Inc.*, No. 16 C 1382 (Dkt. 1) (S.D.N.Y.). Specifically, DMP alleged "Plaintiff, Westwood One, Inc. is a Delaware corporation with its principal place of business located [in New York]. . . . Defendant DMP is an Illinois corporation and maintains its principal place of business in Wood Dale, Illinois. Accordingly, DMP is a citizen of Illinois for diversity purposes. Thus, Plaintiff and Defendant are citizens of different states." *Id.* at ¶¶ 4–6.

Although DMP argues that "admissions cannot create diversity," citing to *Vasquez v. Visions, Inc.*, 2002 WL 91905 (N.D. Ill. Jan. 24, 2002), the relevant quote from *Vasquez* is the following: "no action of a party can confer subject matter jurisdiction upon a federal court; parties can neither consent to nor waive subject matter jurisdiction." *Id.* at *5. But these admissions do not constitute consent to or waiver of subject matter jurisdiction in a case where it otherwise does not exist. Instead, they constitute admissions against interest—most significantly

the admission by DMP in *Westwood One, Inc.* that it is an Illinois company diverse from a Delaware company with its principal place of business in New York—that carry evidentiary weight. *See, e.g., Molinos Valle Del Cibao*, 633 F.3d at 1342 (permitting admissions concerning domicile that were not self-serving, but instead worked against interest); *see also* Fed. R. Evid. 801(d)(2)(A). For this reason, DMP should not be permitted to selectively argue that it is a single company with both Delaware and Illinois incorporations to manipulate federal diversity jurisdiction to its benefit. In total, the requirements of diversity jurisdiction are satisfied, and DMP's motion to vacate and dismiss (Dkt. 88) is denied.

## II.    Radio One's Motions

Radio One initiated these post-judgment proceedings pursuant to Federal Rule of Civil Procedure 69(a), "which instructs district courts to follow the law of supplementary proceedings of the state in which they sit." *Laborers' Pension Fund v. Pavement Maintenance, Inc.*, 542 F.3d 189, 191 (7th Cir. 2008). Accordingly, the Court proceeds under the Illinois statute governing supplementary proceedings, 735 ILCS 5/2–1402. That statute permits a judgment creditor "to prosecute supplementary proceedings for the purposes of examining the judgment debtor or any other person to discover assets or income of the debtor not exempt from the enforcement of the judgment . . . and of compelling the application of non-exempt assets or income discovered toward the payment of the amount due under the judgment." 735 ILCS 5/2–1402(a). Put differently, supplementary proceedings under Section 2–1402 are designed to assist a judgment creditor in discovering assets of the judgment debtor to satisfy an unpaid judgment. *Pyshos v. Heart–Land Dev. Co.*, 258 Ill. App. 3d 618, 622–23 (1st Dist. 1994). Under Section 2–1402(m), proper service of a citation to discover assets creates a lien that "binds nonexempt personal property, including money, choses in action, and effects of the judgment debtor . . . ." 735 ILCS

5/2–1402(m). The lien is perfected on the date the citation is served. *Cacok v. Covington Electric Co., Inc.*, 111 F.3d 52, 53 (7th Cir. 1997).

"Section 2–1402 is to be construed liberally, not only providing for the discovery of a debtor's assets and income, but also vesting the courts with 'broad powers to compel the application of discovered assets or income to satisfy a judgment.'" *City of Chicago v. Air Auto Leasing Co.*, 297 Ill. App. 3d 873, 878 (1st Dist. 1998) (citing *Kennedy v. Four Boys Labor Service, Inc.*, 279 Ill. App. 3d 361, 367 (2d Dist. 1996)); *accord Society of Lloyd's v. Estate of McMurray*, 274 F.3d 1133, 1135 (7th Cir. 2001). The "court at any time may . . . control and direct the proceeding to the end that the rights and interests of all parties and persons involved may be protected and harassment avoided." ILCS S. Ct. Rule 277(e).

### A. Radio One's Motion to Set Aside Fraudulent Transfers and For Turnover of Certain Assets (Dkt. 84)

The supplementary proceeding statute states that a court may order a judgment debtor to turn over non-exempt assets or income "to which his or her title or right of possession is not substantially disputed," provided those assets are "in his or her possession or control." 735 ILCS 5/2–1402(c)(1). In addition, "the court may also order a third party to turn over assets to the creditor if those assets do, in fact, belong to the judgment debtor." *Dexia Credit Local v. Rogan*, 629 F.3d 612, 624 (7th Cir. 2010). Here, Radio One argues that the supplementary proceedings statute and the Illinois Uniform Fraudulent Transfer Act together permit the Court to order DMP to turn over certain funds that DMP transferred to either Dang, TelDebt, or Tucci on dates after the default judgment was entered, after the citation was served, and during the pendency of the bankruptcy proceedings. (Dkt. 75) at 7.

The Illinois UFTA provides that a transfer of property "may be set aside as fraudulent if the transfer tends to hinder or defeat the rights of the grantor's creditor." *Regan v. Ivanelli*, 246

Ill. App. 3d 798, 803 (2d Dist. 1993). The Illinois UFTA recognizes two categories of fraudulent conveyances: transfers that are "fraud in fact" or actual fraud and those that are "fraud in law" or constructive fraud. Section 5(a)(1) defines actual fraud as the following:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (1) with actual intent to hinder, delay, or defraud any creditor of the debtor

740 ILCS 160/5(a)(1).

On such a claim "[d]irect proof of actual intent to defraud is not required—indeed, it would be hard to come by—and a [creditor] can prove actual intent by circumstantial evidence." *Frierdich v. Mottaz*, 294 F.3d 864, 869–70 (7th Cir. 2002). Courts will often look to the "badges of fraud" as circumstantial evidence of intent. *Id.* The "badges of fraud" include: [W]hether the debtor retained possession or control of the property after the transfer, whether the transferee shared a familial or other close relationship with the debtor, whether the debtor received consideration for the transfer, whether the transfer was disclosed or concealed, whether the debtor made the transfer before or after being threatened with suit by creditors, whether the transfer involved substantially all of the debtor's assets, whether the debtor absconded, and whether the debtor was or became insolvent at the time of the transfer. *Id.*; 740 ILCS 160/5(b)(1)–(11). The intent to defraud "will be found if the circumstances indicate that the main or only purpose of the transfer was to prevent a lawful creditor from collecting a debt." *King v. Ionization Int'l, Inc.*, 825 F.2d 1180, 1186 (7th Cir. 1987).

Alternatively, Section 6(a) defines constructive fraud as the following:

> [a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was

insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

740 ILCS 160/6(a). For constructive fraud, the transferor need not intend for the transfer to hinder his or her creditors in order for the transfer to be voidable under this provision. *See Nostalgia Network, Inc. v. Lockwood*, 315 F.3d 717, 719 (7th Cir. 2002) ("When a person transfers money or other property to another person without receiving anything in return, and the transferor is insolvent (or made insolvent by the transfer), the transfer is voidable even if there was not intent to hinder creditors."). Rather, transfers made for less than reasonably equivalent value, leaving a debtor unable to meet its obligations, are deemed or presumed to be fraudulent. *In re Zeigler*, 320 B.R. 362, 374 (Bankr. N.D. Ill. 2005). Whether "reasonably equivalent value" has been given is typically a question of fact. *Id.*

Here, Radio One argues that 90 transfers made out of four bank accounts associated with DMP from October 28, 2016 to February 22, 2017 should be voided under either Section 5(a)(1) or 6(a). But before the Court reaches a determination on whether the transfers at issue were actually or constructively fraudulent, the Court notes that Radio One's fraud claim pending against Tucci in the separate action (No. 17 C 7892) is based on the same post-judgment, post-citation, and post-bankruptcy transfers to Dang, TelDebt, and Tucci. *See* No. 17 C 7892, (Dkt. 1). On account of the fact-intensive inquiry inherent in fraud claims and the posture of these two proceedings, coupled with the fact that the basis for the fraud claim in this proceeding and in No. 17 C 7892 are identical, the Court denies Radio One's present motion to allow for fulsome discovery and potential trial on this claim in the related action. *Cf. Michelson v. Schor*, 1997 WL 282929, at *4 (N.D. Ill. May 16, 1997) (after supplementary proceeding motion for turnover order failed, new proceeding bringing the same claims under a fraudulent-transfer cause of action was barred by *res judicata* and collateral estoppel); *Ennenga v. Starns*, 677 F.3d 766, 776 (7th

Cir. 2012) (under Illinois law, "[r]es judicata applies if there is (1) a final judgment on the merits in an earlier action; (2) an identity of the causes of action; and (3) an identity of parties or their privies"). The denial is without prejudice to renewal.

**B.       Radio One's Motion for Contempt (Dkt. 78)**

Despite the deferral of the decision of whether the transfers were fraudulent, the Court may still consider whether certain transfers were unlawful.

**1.       Civil Contempt**

Here, Radio One aasks the Court to find DMP and Tucci in civil contempt for making transfers from DMP's accounts to Dang and Tucci in violation the citation's restraining provision. (Dkt. 78). DMP filed a brief in opposition to Radio One's motion. (Dkt. 85).

**a.       DMP's Compliance with the Citation to Discover Assets**

To protect assets from improper transfers, Illinois permits a citation to discover assets to include, as it does in the DMP Citation, a restraining provision that "prohibit[s] the party to whom it is directed from making or allowing any transfer or other disposition of, or interfering with, any property not exempt from the enforcement of the judgment therefrom . . . until the further order of the court or the termination of the proceeding, whichever occurs first." 735 ILCS 5/2–1402(f)(1). The purpose of this is to prevent the citation respondent "from transferring funds which may become due to the judgment debtor, in order to insure that the latter does not abscond with money that is due." *Cacok*, 111 F.3d at 54 (quoting *Kirchheimer Bros. Co. v. Jewelry Mine, Ltd.*, 100 Ill. App. 3d 360, 362 (1st Dist. 1981)). In other words, the statute "provides a means of forestalling the judgment debtor or a third party from frustrating the supplementary proceedings before the judgment creditor has had an opportunity to reach assets, indebtedness or income in the possession of debtor or of a third party." *Kirchheimer Bros. Co.*, 100 Ill. App. 3d at 362.

A citation respondent who fails to comply with the terms of the citation risks sanctions. *See Mendez v. Republic Bank*, 725 F.3d 651, 662 (7th Cir. 2013). The statute provides:

> The court may punish any party who violates the restraining provision of the citation as and for a contempt, or if the party is a third-party may enter judgment against him or her in the amount of the unpaid portion of the judgment and costs allowable under this Section, or in the amount of the value of the property transferred, whichever is lesser.

735 ILCS 5/2–1402(f)(1); *see also* ILCS S. Ct. Rule 277(h) ("[a]ny person who fails to obey a citation . . . may be punished for contempt."). To recover from DMP, Radio One must show (1) that it has an enforceable judgment, (2) that it properly served a citation upon DMP, and (3) that DMP transferred its assets in violation of the citation's restraining provision. *Mendez*, 725 F.3d at 663 (citing *In re Weitzman*, 381 B.R. 874, 882 (Bankr. N.D. Ill. 2008)).

Here, there is no dispute as to the first two elements, although DMP raises an issue as to when Tucci personally became aware of the citation, which is discussed below. More meaningfully, DMP disputes the third element. Although DMP does not dispute that transfers were made from DMP's accounts following service of the citation, it argues that the monies transferred did not actually belong to DMP. (Dkt. 85) at 8. In particular, DMP's theory is that the funds transferred out of DMP's accounts post-citation had been originally—at some unspecified time—cash deposited in its accounts "by Tucci, Teldebt and FDATR," and that "cash" was actually the proceeds of (presumably various) loans. *Id.* In support of this argument, DMP cites *Nat'l Life Real Estate Holdings, LLC v. Scarlato*, 2017 IL App (1st) 161943, which decided the issue of whether loan proceeds are property of a judgment debtor, but only did so *after* the transfers occurred in this case. Accordingly, DMP argues that prior to *Scarlato* "uncertainty [existed] in Illinois over the nature of the alleged property in this case and whether it was in fact property of the debtor subject to Section 2-1402." (Dkt. 85) at 8.

There are multiple problems with this argument, not the least of which is DMP's completely unsupported theory that the "cash" transfers were made with proceeds from loans made by Tucci, TelDebt, and FDATR or were somehow connected to a loan (or loans) that Tucci had guaranteed for DMP. Regarding Tucci, TelDebt, and FDATR, DMP only states that it "had previously avoided bankruptcy only by substantial funds from FDATR, Teldebt and Tucci" and that, during the calendar year 2016, those three had contributed more to DMP than had been transferred out of DMP. *Id.* at 4. But the simple fact that Tucci, TelDebt, and FDATR transferred money to DMP does not automatically convert such amounts into "loan proceeds," and DMP has not offered any evidence to create any sort of factual question as to whether these amounts were loans instead of no-strings-attached cash transfers. This is particularly true in light of the evidence adduced at the preliminary injunction hearing in Case No. 17 C 7892 that all transfers of this sort were described simply as "intercompany transfers" by DMP and that no corresponding loan documentation was either created or maintained. *See* No. 17 C 7892, (Dkt. 47) (Tr. Vol. 1) at 148:21–149:3 (Testimony of D. Tucci), (Dkt. 48) (Tr. Vol. 2) at 240:16–241:1 (Testimony of A. Maltese). In addition, Tucci's and DMP's various statements that the funds DMP transferred to other entities were used to pay DMP bills (*see* (Dkt. 85) at 5) further undercuts the loan theory, because it would mean that, for example, TelDebt and FDATR loaned money to DMP and then when DMP repaid the loan, TelDebt and FDATR also proceeded to pay DMP's bills. Calling the transfers loans makes little sense.

The argument concerning the $1 million in loans Tucci guaranteed for DMP is similarly indistinct and unsupported. DMP has not offered any documentation regarding any such loans or to support its assertion that proceeds of the loans existed in its account at the time of the transfers at issue, nor does it explain how the specific transfers at issue here involved only proceeds of

those loans. Indeed, the bank statements submitted in connection with Radio One's turnover motion (*see, e.g.*, (Dkts. 76-1, 76-4, 76-5)) reflect various other deposits into the accounts before and during the time periods at issue. Accordingly, the record before the Court does not lend support to DMP's argument that the post-citation, pre-bankruptcy transfers were comprised of "loan proceeds."

Further, despite DMP's contention that the question of whether "loan proceeds" could be considered property of a judgment debtor subject to a citation restraint was undecided until *Scarlato* was issued by the Illinois Appellate Court on July 24, 2017, the circumstances in this case do not present the close issue that was addressed in *Scarlato*. There, the plaintiff issued a citation to discover assets to a third-party bank. After receipt of the citation, the bank issued a loan to one of the judgment debtors and two entities that he owned (the "borrowers"). 2017 IL App (1st) 161943, ¶ 6. After the loan was finalized, the borrowers requested an advance of the full amount of the loan and instructed the bank to disburse and pay all the proceeds over time to a construction escrow agent and other accounts. *Id.* at ¶ 9. Thus, at issue in *Scarlato* were the proceeds of formally documented loans that were never disbursed or distributed to the judgment debtor personally and were used to satisfy the obligations of other entities, not of the judgment debtor himself. *Id.* at ¶ 34. Even in this situation, the court found that the proceeds were property of the judgment debtor.

In contrast, here there is no loan documentation, the proceeds of the alleged loans were distributed directly into DMP's bank accounts, and they were also used to satisfy DMP's obligations. *See* (Dkt. 85) at 4 ("Direct Media had previously avoided bankruptcy only by substantial funds from FDATR, Teldebt and Tucci"), 5 ("Redeposits that were made to [a TelDebt BOA] account were used 'to pay DMP debts.'"). Thus, there is no question, either

before *Scarlato* and especially not after *Scarlato*, that the funds in DMP's accounts constituted its property for purposes of the citation restraint. The Illinois legislature's intent to broadly frame the scope of the "property" to which a citation should apply combined with common sense support this result, which does not rely on *Scarlato*'s reasoning: if judgment debtors were able to claim, without documentation, that any of their assets are loan proceeds while still maintaining complete control over disbursement of the alleged proceeds, the purpose of the statute undoubtedly would be easily frustrated. *See also Scarlato*, 2017 IL App (1st) 161943, at ¶ 27 ("[W]e do not believe that Illinois case law completely lacks insight that would help answer the questions we face here"—namely whether the bank, as a citation respondent, violated the restraining portion of the citation, and whether the proceeds of the loan at issue in that case were to be considered property belonging to the judgment debtor under Section 1402(f)(1)); *e.g.*, *United States v. Kristofic*, 847 F.2d 1295, 1296 (7th Cir. 1988) ("[a]s a matter of basic principles, loan proceeds do not remain the property of the lender").

In all, the Court concludes that the DMP funds transferred between the citation receipt date and the bankruptcy filing date were DMP's funds and thus the transfers were made in violation of the citation. Radio One has set forth a *prima facie* case that DMP violated the citation's prohibition against transferring its funds. *See, e.g., Shales v. T. Manning Concrete, Inc.*, 847 F. Supp. 2d 1102, 1116 (N.D. Ill. 2012) (where president of debtor company opened a new bank account in the company's name, deposited company assets into the account, and subsequently cased assets of the company to be disbursed from that account—all after receipt of a citation—he caused an illegal disposition of the assets in violation of the citation); *Shales v. Lanas Constr.*, 2010 WL 3842362, at *8 (N.D. Ill. Sept. 24, 2011) (holding a corporate officer liable for transfers made from company assets after a citation to discover assets was served but

before a bankruptcy proceeding was initiated); *Divane v. Sunstrand Elec. Co.*, 2004 WL 1323287, at *2 (N.D. Ill. June 14, 2004) ("A corporate officer's transfer of assets in the ordinary course of business of the cited judgment debtor is a violation of the prohibition of the citation."); *accord Air Auto Leasing Co.*, 297 Ill. App. 3d at 878.

### b.     Contumacious Conduct

After being satisfied as to proper service of a citation based on a final and enforceable judgment and that the citation's prohibition against transfer was violated, if contempt sanctions are sought, the court next looks to whether the violation was contemptuous. *In re Weitzman*, 381 B.R. at 882. "To hold a party . . . in civil contempt, the district court must be able to point to a decree from the court which set[s] forth in specific detail an unequivocal command which the party . . . in contempt violated." *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 738 (7th Cir. 1999). As the *Jones* court further explained:

> civil contempt proceedings may be classified into two categories. Coercive sanctions, which are really the essence of civil contempt, seek to induce future behavior by attempting to coerce a recalcitrant party or witness to comply with an express directive from the court. Remedial sanctions, by contrast, are backward-looking and seek to compensate an aggrieved party for losses sustained as a result of the contemnor's disobedience of a court's order or decree made for the aggrieved party's benefit. However, irrespective of the nature of the civil contempt, whether it be coercive or remedial, any sanction imposed by the court must be predicated on a violation of an explicit court order.

*Id.* Here, Radio One seeks coercive and remedial civil contempt sanctions in the form of (1) a monetary sanction in the amount transferred in violation of the citation—$154,500 (plus interest), (2) an order that DMP and Tucci pay apparently all of the "attorneys' fees Radio One expends in these supplementary proceedings," and (3) placement of Tucci in custody until he pays the contempt sanctions or, alternatively, demonstrates that he is unable to do so. (Dkt. 79) at 9.

"To prevail on a request for a contempt finding, the moving party must establish by clear and convincing evidence that (1) a court order sets forth an unambiguous command; (2) the alleged contemnor violated that command; (3) the violation was significant, meaning the alleged contemnor did not substantially comply with the order; and (4) the alleged contemnor failed to make a reasonable and diligent effort to comply." *U.S. S.E.C. v. Hyatt*, 621 F.3d 687, 692 (7th Cir. 2010). The above discussion concerning the citation violation covers the first and second elements of this analysis (and rejects DMP's arguments that the citation was ambiguous based on the state of the law prior to *Scarlato* for the reasons stated above), and arguably the third as well. To reiterate, by transferring large sums that were indeed its own property, DMP did not "substantially" comply with the citation's restraining provision.

Looking, then, at the fourth element—whether DMP failed to make a reasonable and diligent effort to comply—DMP argues that Radio One has failed to show by clear and convincing evidence exactly when Tucci gained knowledge of the citation. In support of its position that Tucci "knowingly flouted the provisions of Radio One's citation," Radio One points to deposition testimony where Tucci confirmed (1) that he knew that Radio One issued a citation to discover assets on DMP, (2) that transfers were made after the citation, and (3) that he knew at the time that the citation was supposed to freeze the assets of DMP. *See* (Dkt. 79) at 8; *see also* (Dkt. 75-19) (1/31/17 2004 Exam Tucci Dep.) at 45:17–46:11. In addition to this testimony, certain testimony by Tucci from the preliminary injunction hearing in the related fraud and veil-piercing action is relevant to this topic. At that hearing, Tucci admitted that although he had not "receive[d] a copy of the citation," he had email communications with an attorney *regarding the citation* on November 14 and 15 and that he acted on the attorney's advice with regard to transfers from DMP's U.S. Bank accounts. *See* No. 17 C 7892, (Dkt. 49) (Tr. Vol. 3) at 349:18–

22, 351:18–352:6, 353:10–15. This testimony was corroborated by a November 15, 2016 email from Tucci to his executive assistant Desiree Keller instructing her to "Send the latest Citation paperwork that is being sent to USBank" to his attorney, collect documents needed to open new bank accounts at Citibank, and to switch the tax IDs on certain of Direct Media Power's accounts and add "doing business as" designations to Dang accounts. *See* No. 17 C 7892, PHX 48. The Court concludes that this is clear and convincing evidence that Tucci knew of the citation no later than November 14, 2016.

Finally, DMP argues that Radio One has failed to set forth adequate evidence to prove that Tucci personally made any of the transfers at issue. (Dkt. 85) at 9. This argument ignores Tucci's general statements that he was the only individual with the authority to authorize wire transfers or sign checks on DMP's behalf. *See* (Dkt. 75-18) (341 Meeting) at 22:3–6 ("I'm the only person authorized to do wires, I'm the only person allowed to stamp checks. Small credit card debit transactions could have been done by my assistant."). But regardless, it is well established that an individual officially responsible for a corporation's compliance with a court order may be punished for contempt if he fails to act appropriately. *Tranzact Technologies, Inc. v. 1Source Worldsite*, 406 F.3d 851, 856 (7th Cir. 2005); *see also Air Auto Leasing Co.*, 297 Ill. App. 3d at 879 ("It is well-settled that corporate officers are obligated to obey judicial orders directed at their corporations."). Thus, Tucci's knowledge of the citation plus his knowledge of the transfers at issue, which is not disputed, together form a sufficient basis on which the Court concludes that DMP failed to make a reasonable and diligent effort to comply with the citation.

### c.     Sanctions

Again, there is no doubt that an individual officially responsible for a corporation's compliance with a court order may be punished for contempt if he fails to act appropriately.

*Tranzact Technologies, Inc.*, 406 F.3d at 856; *see Connolly v. J.T. Ventures*, 851 F.2d 930, 935 (7th Cir. 1988); *Shales*, 2010 WL 3842362, at *8. Here, Tucci was DMP's president and CEO, as well as its sole board member and the majority owners of the holding company that owned DMP. "He kept the books and controlled the accounts. He exerted control over DMP's daily operations and authorized every transaction." *In re Direct Media Power, Inc.*, 582 B.R. at 753–54. Further, Tucci took the actions that created the citation noncompliance by DMP. Tucci knew that a citation to discover constituted an asset freeze, and yet they continued to make transfers out of the accounts. Tucci has been afforded with due process with respect to this motion. The Court therefore finds that the prerequisites have been met to hold Tucci in contempt for the post-citation and pre-bankruptcy transfers taken in violation of the citation's restraint. *See Laborers' Pension Fund v. A & C Envtl., Inc.*, 2005 WL 994525, at *2 (N.D. Ill. Apr. 19, 2005) (under Illinois law, corporate officers are personally liable when they permit the corporation to make non-exempt payments in violation of the citation) (collecting cases); *e.g.*, *Shales*, 847 F. Supp. 2d at 1117 ("As sole shareholder and President of T. Manning Concrete, Inc., Manning violated the Citation and is personally liable for the transfer of Company assets after service of the Citation."); *A & C Envtl., Inc.*, 2005 WL 994525, at *4 (holding corporate president personally liable for $134,889.71 for corporate transfers made in violation of a citation); *Laborers' Pension Fund v. Dominic Jr., Inc.*, 2003 WL 21310282, at *4 (N.D. Ill. June 5, 2003) (recommending "that Defendant Dominic, Jr., Inc. and its president Dominic Giannini, Jr. be found in contempt of court for violation of the lien imposed at the time of the service of the citation to discover assets, and that judgment be entered against Dominic Giannini, Jr. personally in the amount $86,202.22.").

The Court accordingly grants Radio One's request for an entry of judgment against Tucci. Section 2–1402(f)(1) authorizes an entry of judgment "in the amount of the unpaid portion of the judgment and costs allowable under this Section, or in the amount of the value of the property transferred, whichever is lesser." The Court thus enters judgment against Tucci in the amount of the transfers from DMP that occurred on or after November 14, 2016 and before the initiation of Chapter 11 proceedings—$154,500 plus costs incurred before this Court—but not for interest. In addition, because it is holding Tucci in civil contempt of court, the Court awards Radio One its reasonable attorneys' fees expended in bringing the instant contempt motion. *See W. Bend Mut. Ins. Co. v. Belmont State Corp.*, 712 F.3d 1030, 1035 (7th Cir. 2013) (a court may award attorneys' fees as part of the penalty under Section 5/2–1402(f)(1)) (citing *Mid-American Elevator Co. v. Norcon, Inc.*, 287 Ill. App. 3d 582, 591 (1st Dist. 1996)). The Court declines to entertain the other relief requested by Radio One (payment of all attorneys' fees in the supplementary proceeding and holding Tucci in custody until payment of the sanction is made).

### 2. Criminal Contempt and Referral to the United States Attorney's Office

In addition to its request for civil contempt, Radio One summarily urges the Court to refer the matter to the United States Attorney's Office to initiate prosecution of Tucci for criminal contempt under 18 U.S.C. § 401, again for violation of the citation's restraining provision. (Dkt. 79) at 10. "The legal system has a vital interest in assuring compliance with lawful judicial orders and punishing those who defy them." *Mid-Am. Waste Sys., Inc. v. City of Gary, Ind.*, 49 F.3d 286, 293 (7th Cir. 1995) (where district court found that litigant intentionally disobeyed an injunction and fabricated an excuse for that conduct, sending a copy of the opinion

to the United States Attorney for the Northern District of Indiana for criminal consideration). However, the Court declines to officially make such a referral at this time.

## CONCLUSION

For the reasons explained above, the Court finds that it has proper diversity jurisdiction in the matter and therefore denies DMP's motion to vacate the default judgment and dismiss the action. (Dkt. 88). Further, the Court denies without prejudice to renewal Radio One's motion for fraudulent transfer and turnover order. (Dkt. 74). Finally, on Radio One's motion for contempt (Dkt. 78), the Court finds that Radio One has presented clear and convincing evidence that DMP and Tucci knowingly violated the citation's restraining provision and are therefore in contempt of the citation. Radio One's motion is therefore granted to the extent it seeks to hold DMP and Tucci in civil contempt. The motion is denied, however, to the extent it seeks to initiate a criminal contempt proceeding. In line with this ruling, the Court awards Radio One the following amounts entered against Tucci: (1) $154,500 and (2) reasonable attorneys' fees and costs for bringing the contempt motion. Radio One shall submit a fee petition to the Court on or before October 21, 2018.

Hon. Virginia M. Kendall
United States District Judge

Date: September 28, 2018

24